**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MAGNESIUM CORPORATION OF AMERICA,<br>*et a.l*,[1]<br><br><br>                                              Debtors. | Chapter  7<br><br>Case No. 01-14312 (MKV)<br><br>(Jointly Administered) |
| THE RENCO GROUP, INC.,<br><br>            Plaintiff,<br><br><br>                    v.<br><br>WILMINGTON TRUST, NATIONAL<br>ASSOCIATION, in Its Capacity as Indenture<br>Trustee Under the Indenture Dated as of July 1,<br>1996 Among Renco Metals, Inc., Issuer,<br>Magnesium Corporation of America and Sabel<br>Industries, Inc., Guarantors, and Wilmington<br>Trust, National Association, Successor Trustee,<br>Relating to 11½% Senior Notes Due 2003,<br><br>            Defendant. | Adv. Pro. 16-01073 (MKV) |

**MEMORANDUM OPINION AND ORDER**
**<u>GRANTING MOTION TO DISMISS</u>**

*A P P E A R A N C E S:*
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for The Renco Group, Inc.*
1633 Broadway
New York, New York 10019
By:     David M. Friedman
         David S. Rosen
         Adam L. Shiff
         Alycia Regan Benenati
         Shai Schmidt

---

[1] The Debtors in these cases are Renco Metals, Inc. (Case No. 01-14311) and Magnesium Corporation of America (Case No. 01-14312).

BROWN RUDNICK LLP
*Counsel to the Indenture Trustee*
One Financial Center
Boston, Massachusetts 02111
By:    Jeffrey L. Jonas
       James W. Stoll
       Brian T. Rice
       Brian M. Alosco

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**

The Renco Group, Inc. (the "Renco Group") commenced this action seeking to disallow

nearly $170 million in claims (the "Bond Claims")[2] filed against Renco Metals, Inc. ("Metals")

and Magnesium Corporation of America ("MagCorp" and together with Metals, the "Debtors")[3]

by a predecessor in interest to Wilmington Trust, N. A., in its capacity as indenture trustee

("Wilmington Trust")[4] pursuant to an indenture dated as of July 1, 1996 (the "Indenture"), pursuant

to which Metals issued certain bonds due in 2003 (the "Bonds"), and on behalf of certain holders

of the Bonds (the "Bondholders"). *See Complaint* (the "Complaint" or "Compl.") [ECF No. 1].

Wilmington Trust now moves to dismiss this adversary proceeding. *See Motion to Dismiss*

[ECF No. 18]. After the Court heard oral argument on the Motion to Dismiss (the "First Hearing"

or "First Hr'g"), the Second Circuit issued an order affirming a District Court judgment in a related

---

[2] Identical Bond Claims have been asserted against each of the Debtors. *See Amended Proof of Claim of Wilmington Trust, National Association as Indenture Trustee for 11½% Senior Notes Due 2003* (the "Wilmington Trust Mag Corp. Proof of Claim") [Case No. 01-14312, Proof of Claim No. 31]; *Amended Proof of Claim of Wilmington Trust, National Association as Indenture Trustee for 11½% Senior Notes Due 2003* (the "Wilmington Trust Metals Proof of Claim" and together with the Wilmington Trust Mag Corp. Proof of Claim, the "Wilmington Trust Proofs of Claim") [Case No. 01-14311, Proof of Claim No. 2].

[3] The Renco Group owns 100% of Metals and Metals owns 100% of MagCorp. Compl. ¶ 1.

[4] The Bond Claims were originally filed by State Street Bank and Trust Company ("State Street"). *See* Wilmington Trust Proofs of Claim. Wilmington Trust succeeded State Street, a successor indenture trustee, and Fleet National Bank ("Fleet"), the original indenture trustee, pursuant to an Appointment and Acceptance Agreement dated September 27, 2016. *See Motion to Substitute Party and Amend Case Caption* (the "Motion to Substitute") Ex. A [ECF No. 17]. Pursuant to the Motion to Substitute, Wilmington Trust was substituted for State Street as a defendant in this adversary proceeding.

litigation, which counsel to Wilmington Trust had argued at the First Hearing could impact the outcome of its Motion to Dismiss. This Court then directed supplemental briefing on the impact, if any, of the Second Circuit's decision, and thereafter, heard argument on the issues addressed in the supplemental briefing (the "Supplemental Hearing" or "Suppl. Hr'g"). Having considered all arguments raised by the parties, for the reasons set forth below, the Motion to Dismiss is granted.

### JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Renco Group and Wilmington Trust consented to the entry of a final order or judgment by this Court at the First Hearing. *See* First Hr'g Tr. 5:1–12; 6:15-20 [ECF No. 31].

### BACKGROUND

The extensive factual, procedural and legal history of the underlying bankruptcy cases and the associated litigations spans approximately 17 years. The Court therefore limits its discussion to the facts most directly relevant to the Motion to Dismiss.

On August 2, 2001 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, on the following day, the Honorable Robert E. Gerber[5] ordered that the cases be jointly administered. *See Order Pursuant to Bankruptcy Rule 1015 Directing Joint Administration of Chapter 11 Cases* [Case No. 01-14312, ECF No. 5]. The

---

[5] These cases were originally assigned to Judge Gerber, but upon his retirement were reassigned to the Honorable Mary Kay Vyskocil.

following month, the cases were converted to cases under chapter 7 of the Bankruptcy Code, *see*

*Order Converting Chapter 11 Cases to Cases Under Chapter 7* [Case No. 01-

14312, ECF No. 419], and Lee E. Buchwald was appointed as the chapter 7 trustee (the "Trustee").

*See Appointment of Interim Trustee and Trustee and Designation of Required Bond* [Case No. 01-

14312, ECF No. 421].

## A.    Claims Against the Debtors

At the time the Renco Group commenced this adversary proceeding, hundreds of claims

had been filed against the Debtors.  The principal liabilities included the Bond Claims and various

unliquidated environmental claims (collectively, the "Environmental Claims") asserted by, *inter*

*alia*, the United States Environmental Protection Agency ("EPA") and the Department of Interior

(the "DOI," and together with EPA, the "Government").[6]   *See Twenty-Seventh Interim Status*

*Report of Chapter 7 Trustee*, filed on May 10, 2016 (the 27th Interim Report") ¶ 52 [Case No. 01-

14312, ECF No. 708].

The Bond Claims arise out of  a $150 million public bond offering by Metals in 1996

pursuant to the Indenture (the "1996 Bond Offering"), the obligations under which were

guaranteed by MagCorp.  *See* Wilmington Trust Proofs of Claim ¶¶ 8-14; Compl. ¶¶ 12-20.

According to the Wilmington Trust Proofs of Claim and the Complaint, as of the Petition Date,

the aggregate amount owing to the Bondholders under the Indenture totaled $150 million in

principal and nearly $19.6 million in interest.  *See* Wilmington Trust Proofs of Claim ¶ 8;

Compl. ¶ 19.  The Environmental Claims derive from, *inter alia,* alleged (i) violation(s) of the

---

[6] The Government filed identical proofs of claim against each of the Debtors. *See Proof of Claim of the United States Of America on Behalf of the United States Environmental Protection Agency and the United States Department of the Interior* (the "Government MagCorp Proofs of Claim") [Case No. 01-14312, Proofs of Claim Nos. 60-63]; *Proof of Claim of the United States Of America on Behalf of the United States Environmental Protection Agency and the United States Department of the Interior* (the "Government Metals Proofs of Claim" together with the Government MagCorp Proofs of Claim, the "Government Proofs of Claim") [Case No. 01-14311, Proofs of Claim Nos. 18-20].

4

Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation and Liability Act and (ii) right-of-way and rent liabilities allegedly totaling over $6 million.

At the time the Complaint was filed, the Debtors' Claims Registers reflected claims totaling "approximately $670 million." Compl. ¶ 29. This amount included, *inter alia*, the two Bond Claims and multiple claims filed by the Pension Benefit Guaranty Corporation. It did not include the Environmental Claims which were significant, but unliquidated. *See* 27th Interim Report ¶ 52. Debtors' bankruptcy schedules also indicated approximately $5 million in trade debt. *See* 27th Interim Report ¶ 52.

## B.  Fraudulent Transfer Litigation

On July 31, 2003, the Trustee, on behalf of the Debtors, commenced a fraudulent transfer action (the "Fraudulent Transfer Litigation") against, *inter alia*, the Renco Group and its majority shareholder, Ira Rennert ("Rennert").[7]  *See Amended Complaint* (the "Fr. Transfer Compl.") [Adv. Pro. No. 03-06559, ECF No. 2]. The action arose out of the 1996 Bond Offering and sought to recover certain dividend payments made to, *inter alia*, the Renco Group and Rennert that allegedly were avoidable under the Bankruptcy Code and under New York state law. *See* Fr. Transfer Compl. ¶¶ 115-50, 527-32, 609-14, 615-32, 639-43. The Fraudulent Transfer Litigation was first brought as an adversary proceeding before the Bankruptcy Court (Adv. Pro. No. 03-6559 (MKV)), and thereafter, the District Court granted a motion to withdraw reference to the Bankruptcy Court. *See Order* [Adv. Pro. No. 03-06559, ECF No. 207].

---

[7] At the commencement of the Fraudulent Transfer Litigation, Rennert was the majority shareholder of the Debtors and had been, *inter alia*, (i) Chairman of the Board, Chief Executive Officer and a Director of the Renco Group since 1975, (ii) a Director of Metals since its inception in 1993 and (iii) a Director of MagCorp since 1989. *See* Fr. Transfer Compl ¶ 14.

The Fraudulent Transfer Litigation was subsequently assigned to, and presided over, by the Honorable Alison J. Nathan (Case No. 13-cv-7948), who ultimately conducted a month-long trial. On February 27, 2015, the jury returned a verdict in the Trustee's favor, consisting of, *inter alia*, a $101 million damages award against the Renco Group and a $16.2 million damages award against Rennert. On March 16, 2015, Judge Nathan issued a Memorandum and Order awarding the Trustee pre-judgment interest at the rate of 6% *per annum* from the Petition Date. *See Memorandum and Order* [Case No. 13-cv-7948, ECF No. 342]. The pre-judgment interest increased the overall judgment in that action to $214,697,948.44 (the "Fraudulent Transfer Judgment").

The Renco Group and Rennert appealed the Fraudulent Transfer Judgment to the Second Circuit, and on March 8, 2017, the Second Circuit issued an order, *inter alia*, denying the appeal and affirming the Fraudulent Transfer Judgment. *See Buchwald v. Renco Grp., Inc. (In re Magnesium Corp. of Am.)*, No. 15-02691, 2017 WL 946729 (2d Cir. Mar. 8, 2017) (the "Summary Order"). On October 10, 2017, the United States Supreme Court denied certiorari with regard to the Summary Order and on October 12, 2017, the Second Circuit issued a judgment mandate. *See Renco Grp., Inc. v. Buchwald (In re Magnesium Corp. of Am.)*, 138 S. Ct. 329, 199 L. Ed. 2d 213 (2017).

## C.    The Renco Group's February 2015 Motion for Leave to Object to Creditors' Claims in the Debtors' Bankruptcy Cases

While the Fraudulent Transfer Litigation was pending in the District Court, the Renco Group began taking steps to challenge claims asserted against the Debtors. On December 30, 2014, the Renco Group sent a letter to the Trustee demanding that the Trustee begin bringing objections to claims, alleging, *inter alia*, that: (i) all of the claims asserted against Metals are subject to disallowance for a variety of reasons and (ii) expungement of the claims would have a

6

significant impact with respect to the Fraudulent Transfer Litigation. *See Motion for Leave to Object to Creditors' Claims* (the "Standing Motion" or "Standing Mot.") Ex. C [Case No. 01-14312, ECF No. 681]. The Trustee responded by letter dated January 9, 2015 stating, *inter alia*, that: (i) the estates lacked the sufficient funds to litigate objections and (ii) he believed that the Renco Group's demand that he file certain objections was part of its litigation strategy designed to undermine the then pending Fraudulent Transfer Litigation. *See* Standing Mot. Ex. D.

Following its unsuccessful efforts to persuade the Trustee, the Renco Group sought leave from the Bankruptcy Court for standing and authority pursuant to section 502(a) of the Bankruptcy Code to object to, and file motions with respect to, claims filed or otherwise asserted against the Debtors. *See* Standing Mot. The Renco Group argued, *inter alia*, that by refusing to object to claims, the Trustee had refused to fulfill his responsibilities with respect to claims administration in the bankruptcy cases. *See* Standing Mot. ¶¶ 14–17. The Renco Group further contended that the Trustee's refusal stemmed from a "litigation-driven concern" that, if all of the claims against Metals were disallowed and/or expunged, the Trustee would lose the derivative standing necessary to continue to litigate the Fraudulent Transfer Litigation. *See* Standing Mot. ¶¶ 17–19. The Renco Group argued that, due to the Trustee's inaction, the Renco Group, as a "party in interest" pursuant to section 502(a), should be permitted to take action to determine the validity of claims asserted against Metals. *See* Standing Mot. ¶¶ 20-24.

In response, the Trustee argued that because he was not unreasonably failing to object to claims, the Standing Motion should be denied. *See Response of Chapter 7 Trustee to Motion of The Renco Group, Inc. for Leave to Object to Creditors' Claims* (the "Response" or "Resp.") ¶ 19. [Case No. 01-14312, ECF No. 684]. The Trustee explained (as he had in his January 9, 2015 letter) that because the estates were administratively insolvent, unsecured creditors would not receive a

distribution, and therefore, "the Trustee should not waste time or money on a detailed analysis of claims or objections thereto." Resp. ¶ 19. The Trustee further argued that the Renco Group was "acting solely in its own self-interest, seeking to knock out claims to try to deprive the Trustee of standing to recover the fraudulent conveyances . . . ." Resp. ¶ 22.

On February 10, 2015, Judge Gerber held a hearing on the Standing Motion (the "February 2015 Hearing" or "Feb. 2015 Hr'g") at which he stated that "[t]he only difficult issue . . . is whether this motion should be denied without prejudice out of concerns for judicial restraint, or whether it should be denied with prejudice given how outrageous it is." Feb. 2015 Hr'g Tr. 25:18-21 [ECF No. 695]. Judge Gerber found that the Standing Motion was "tactically driven to affect the [then] ongoing [Fraudulent Transfer Litigation]" and essentially was nothing more than "a blatant heavy handed and bad faith effort to affect the proceedings in that trial . . . ." Feb. 2015 Hr'g Tr. 25:21–23; 25:23–26:1. Judge Gerber further found "the Renco Group to be guilty of both laches and bad faith . . . [as] [t]he claims Renco Group wishe[d] to expunge were filed 12 years [before the Standing Motion and] . . . [i]f Renco Group had any legitimate basis for the relief it now seeks, it could have sought it in the nearly 13 years before it filed its [Standing] [M]otion." Feb. 2015 Hr'g Tr. 35:1–6. Ultimately, Judge Gerber denied the Standing Motion "without prejudice to renewal (A) after the conclusion of the [Fraudulent Transfer Litigation then] pending before Judge Nathan, and (B) after Renco Group . . . comes into the money and has a legitimate interest in the disallowance of other's [sic] claims by reason other than its desire to prevail in a wholly separate judicial proceeding." Feb. 2015 Hr'g Tr. 26:5–10 (hereafter, the "2015 Standing Ruling").

**D.      The Renco Group Adversary Proceeding**

1.      <u>The Complaint</u>

Shortly after the Debtors' cases were reassigned upon Judge Gerber's retirement, in May 2016, the Renco Group again sought to object to the Bond Claims by commencing this adversary proceeding.  In its Complaint, the Renco Group asserts four causes of actions allegedly supporting disallowance of the Bond Claims: (1) equitable disallowance; (2) quasi estoppel; (3) unjust enrichment; and (4) disallowance under section 502(d) of the Bankruptcy Code.  Compl. ¶¶ 31-54.  The Renco Group ultimately seeks full disallowance of the Bond Claims and to ensure that Wilmington Trust, as indenture trustee, cannot recover on either of the Bond Claims "because the [B]ondholders, directly or through their predecessors in interest, ratified the payment of [the] Renco[] [Group's] dividends through their participation in a [the 1996] [B]ond [O]ffering that was expressly initiated and consummated to fund one of those dividends . . . ."  Compl. ¶ 2.

The Renco Group alleges in its Complaint that it has standing to commence this action "as the sole shareholder of . . . Metals."  Compl. ¶ 11  "[I]f, and to the extent, the proceeds of the [Fraudulent Transfer] Judgment are paid to the Chapter 7 trustee, the Debtors will enter the zone of solvency and, under such circumstances, [the] Renco [Group], as the Debtors' residual equity holder, would benefit from any disallowance of the Bond Claims."  Compl. ¶ 3.  The Renco Group further maintains that the 2015 Standing Ruling does not preclude it from commencing this action since that ruling "was issued *before* the Chapter 7 trustee obtained the [Fraudulent Transfer] Judgment, and was predicated upon the Debtors' then administrative insolvency, which, according to the Court, meant that [the] Renco [Group], as a shareholder, was not a 'party in interest' of the Debtors' estates under [s]ection 502(a) [of the Bankruptcy Code]."  Compl. ¶4 (emphasis in original).

9

The crux of the Complaint rests on the allegation that the Bondholders knew or should have known that one of the main purposes of the 1996 Bond Offering was to facilitate the payment of dividends by Metals to the Renco Group.  Specifically, the Renco Group alleges that the 1996 Bond Offering prospectus explicitly disclosed that "one of the main purposes of the [1996] Bond Offering was to facilitate" payment by Metals of dividends to the Renco Group.  Compl.  ¶ 15. The Renco Group also alleges that (i) prior to the 1996 Bond Offering, Metals had made a $13.9 million dividend payment to the Renco Group, which was also disclosed in the prospectus, *see* Compl. ¶ 19, and (ii) in July 1996, using the proceeds from the Bond Offering, Metals made another $75.7 million dividend payment to the Renco Group.  *See* Compl. ¶ 18.  From that point through October 1998, according to the Renco Group, Metals made additional dividend payments totaling approximately $14 million.  *See* Compl. ¶ 18.  The Renco Group contends that by purchasing the Bonds, the Bondholders ratified these dividend payments.  *See* Compl. ¶ 18.

Significantly, these dividend payments to the Renco Group are among the transfers the Trustee sought to recover in the Fraudulent Transfer Litigation.

### 2.    Motion to Dismiss

Wilmington Trust moves to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, each of which are made applicable to this adversary proceeding pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.  Wilmington Trust argues that the Complaint must be dismissed because the Renco Group failed to demonstrate that it has standing to bring this adversary proceeding since the Renco Group failed to seek leave of the Bankruptcy Court to object to the Bond Claims and the Complaint fails to alleged sufficient facts with respect to the existence of a reasonable likelihood that the Debtors' estates will yield a surplus that will be available for distribution to the Renco Group after payment in full of all

allowed claims. *See* Mot. to Dismiss 6-15. In addition, Wilmington Trusts argues that the four

causes of action asserted by the Renco Group are without merit and should be dismissed under

Rule 12(b)(6) for failure to state a claim.

3. Supplemental Briefing

Both the Renco Group and Wilmington Trust have submitted supplemental briefs on the

impact of the Second Circuit's Summary Order. In its supplemental brief, the Renco Group urges

the Court to take judicial notice of the Summary Order and argues that the Summary Order is

relevant to the consideration of the pending motion to dismiss. *See Plaintiff's Supplemental Brief*

*in Opposition to Defendant's Motion to Dismiss* (the "Renco Supplement" or "Renco Suppl.")

¶¶ 12-15 [ECF No. 42]. Specifically, the Renco Group asserts that its payment to the Trustee of

the $213 million Fraudulent Transfer Judgment[8] reinforces the Renco Group's statutory standing

to seek disallowance of the Bond Claims as a "party in interest" under Bankruptcy Code section

502(a). *See* Renco Suppl. ¶¶ 19-29. The Renco Group also reasserts that it has standing as a

shareholder and, for the first time, argues that it is a creditor of the Debtors' estates pursuant to

Bankruptcy Code section 502(h), which according to the Renco Group provides an additional

predicate for the Renco Group's standing to seek disallowance of the Bond Claims. *See* Renco

Suppl. ¶¶ 19-29. This argument was not plead in the Complaint and was raised for the first time

in the Renco Group's supplemental briefing.[9]

Wilmington Trust, by contrast, maintains that the entry of the Summary Order has no effect

on its Motion to Dismiss and argues that dismissal of this adversary proceeding in its entirety

---

[8] Rennert paid a portion of the Fraudulent Transfer Judgment.

[9] The Renco Group also argued, *inter alia*, that: (i) the entry of the Summary Order fully addresses the question of whether the Complaint is ripe for adjudication and (ii) the entry of the Summary Order undermines any notion that, by pursuing this adversary proceeding, the Renco Group is attempting to exercise tactical ploys and tip the scales on the Fraudulent Transfer Litigation. *See* Renco Suppl. ¶¶ 16-18, 30-32.

remains warranted.  *See Supplemental Brief in Further Support of Motion to Dismiss* (the

"Wilmington Supplement" or "Wilmington Suppl.") [ECF No. 43].  Wilmington Trust contends,

*inter alia*, that: (i) the Summary Order does not cure the Renco Group's failure to seek leave from

this Court before filing its Complaint; (ii) even if the Renco Group had followed the mandated

procedures, entry of the Summary Order still would not cure the Renco Group's lack of standing

at the time the Complaint was filed; and (iii) assuming, *arguendo*, that the Renco Group had

followed the mandated procedures and the Court finds that there is a likelihood that a surplus of

funds will be available for distribution to equity, the Renco Group has not alleged sufficient facts

from which the Court may reasonably infer that it has a legitimate interest in the disallowance of

another creditor's claim(s), which showing is required by Judge Gerber's 2015 Standing Ruling.

*See* Wilmington Suppl. 3-5, 9.

## *ANALYSIS*

I.    <u>**Standing Generally**</u>

The party invoking federal jurisdiction bears the burden of demonstrating it has standing

to bring the case.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), *as*

*revised*, (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "Standing to

sue is a doctrine rooted in the traditional understanding of a case or controversy.  The doctrine

developed . . . to ensure that federal courts do not exceed their authority as it has been traditionally

understood." *Spokeo*, 136 S. Ct. at 1547 (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).  There

are two aspects to standing: (1) Constitutional standing and (2) prudential standing.  *See Warth v.*

*Seldin*, 422 U.S. 490, 498 (1975) ("[T]he question of standing is whether the litigant is entitled to

have the court decide the merits of the dispute or of particular issues. This inquiry involves both

constitutional limitations on federal-court jurisdiction and prudential limitations on its

exercise."); *Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1106 (2d Cir. 1992) (holding that a party must demonstrate both Constitutional standing and prudential standing).

### A.      Article III Standing

The Constitutional standing requirement derives from Article III of the Constitution, which provides that the "judicial power" of the United States extends only to "cases" or "controversies." *See* U.S. Const. art. III, § 2.   To establish standing under Article III, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560-61).   The Supreme Court recently made clear in *Spokeo* that "[t]o establish injury in fact, a plaintiff must show that he or she suffered an invasion of a *legally protected interest* that is *concrete and particularized* and *actual or imminent*, not conjectural or hypothetical."   136 S. Ct. at 1548 (internal quotations omitted) (emphasis added) (citing *Lujan*, 504 U.S. at 560).   For an injury to be particularized it must affect the party invoking federal jurisdiction in a personal and individual way, while "concrete injury must be *de facto*; that is, it must actually exist."   *Spokeo*, 136 S. Ct. at 1548 (internal quotations omitted) (emphasis in original) (quoting BLACK'S LAW DICTIONARY 479 (9th ed. 2009)).

The proper procedural challenge to Article III standing is a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), rather than motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).   *See All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006).

Although Wilmington Trust urges a Rule 12(b)(1) analysis here, it neither argues that the Renco Group fails to meet the standing requirements in the Article III  "case or controversy" sense nor cites to the Supreme Court's decision in *Spokeo* or earlier cases discussing Article III standing.

Clearly this Court has authority delegated to it by the District Court, to resolve objections to claims. *See* 28 U.S.C. § 157(b)(2)(B). In apparent recognition of this, Wilmington Trust does not argue that the Court lacks subject matter jurisdiction. Rather, Wilmington Trust argues that the Renco Group is not the proper party to object to the Bond Claims and that it did not follow the requisite procedures to obtain standing to do so. In response, the Renco Group contends that Rule 12(b)(1) is inapplicable here, and argues that the Renco Group has "statutory standing" as a "party in interest" under section 502(a) of the Bankruptcy Code, which is properly analyzed under a Rule 12(b)(6) standard for failure to state a claim.

## B.    Prudential Standing

"The 'prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.'" *Rajamin v. Deutsche Bank Nat. Tr. Co*., 757 F.3d 79, 86 (2d Cir. 2014) (quoting *Warth*, 422 U.S. at 509 (1975)). "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. Prudential limitations on standing is "important in bankruptcy proceedings which often involve numerous parties who may seek to assert the rights of third parties for their own benefit." *In re Ampal-Am. Israel Corp.*, 502 B.R. 361, 369 (Bankr. S.D.N.Y. 2013) (citing *Kane v. Johns–Manville Corp. (In re Johns– Manville Corp.*), 843 F.2d 636, 644 (2d Cir. 1988)) ("The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context. Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself.").

14

The Supreme Court recently clarified that prudential standing (also known as statutory standing) is not really standing in a jurisdictional sense, and as such, a defendant may not bring a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) where the alleged "lack of standing" is merely prudential (*i.e.*, statutory). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 n. 4, 188 L. Ed. 2d 392 (2014). When, as here, a plaintiff asserts a cause of action based on a statute, the Court should inquire "whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark*, 134 S. Ct. at 1387). Prior to the *Lexmark* decision, the Second Circuit had suggested that statutory standing was either "a separate aspect of standing or a part of the prudential aspect of standing." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 126 n. 12 (2d Cir. 2003); *see also Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009). The *Lexmark* decision clarified that the question of whether a particular plaintiff has a cause of action under the applicable statute does not belong to the family of standing inquiries, *Lexmark*, 134 S. Ct. at 1387, because "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case." *Id.* at 1386 n. 4 (emphasis in original) (internal quotation marks omitted).

Accordingly, when a defendant's motion to dismiss challenges a plaintiff's ability to bring an action under an applicable statute, it should be understood as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). *See Henry Avocado Corp. v. Z.J.D. Brother, LLC*, No. 17-CV-4559 (ARR), 2017 WL 6501864, at *2 (E.D.N.Y. Dec. 19, 2017); *see also Alphas Co. v. Hunts Point Terminal Produce Coop.*, No. 1:14-CV-00145 (ALC), 2017 WL 1929506, at *3 (S.D.N.Y. May 9, 2017) (holding that the defendants'

motions to dismiss for lack of standing under the Racketeer Influenced and Corrupt Organizations Act "should have been brought under Rule 12(b)(6), not 12(b)(1).")

Based on the foregoing, Wilmington Trust's challenge to the Renco Group's standing to bring this adversary proceeding must be reviewed pursuant to Rule 12(b)(6).

## II.   Federal Rule of Civil Procedure 12(b)(6)

In considering a motion to dismiss for failure to state a claim for relief under Rule 12(b)(6), a court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992). However, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Moreover, "[t]hreadbare recitals of the elements of a cause of action supported by conclusory statements" do not constitute sufficient factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557)). "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy*, LLC, 647 F.3d 419, 430 (2d Cir. 2011) (citing

*Iqbal*, 556 U.S. at 547-82).  Accordingly, courts are "'not required to draw unreasonable inferences or to credit legal conclusion at odds with the plaintiff's own factual allegations.'"  *See BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 15 (S.D.N.Y. 2012) (quoting *Solow v. Stone*, 994 F.Supp. 173, 181 (S.D.N.Y. 1998); *see also Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 369 F. Supp. 2d 353, 359 (E.D.N.Y. 2005) (holding the court was not "obligated to draw unreasonable inferences in plaintiffs' favor.") (citing *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 170 F.R.D. 361, 376 (S.D.N.Y. 1997)).

When considering a motion to dismiss, a court also may consider documents attached to or incorporated into a complaint by reference, documents that are integral to the complaint and relied upon in it, and facts of which judicial notice may be taken.  *See Grant v. County of Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).  "A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" *Goel v. Bunge, Ltd.*, No. 15–3023–cv, 2016 WL 1696597, at *3 (2d Cir. Apr. 28, 2016) (quoting *Chambers v. Time Warner Inc.,* (*In re Chambers*), 282 F.3d 147, 153 (2d Cir. 2002)).  However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *accord Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008).[10]

---

[10] The Renco Group devotes the first section of its supplemental briefing to a request that the Court take judicial notice of the Second Circuit's Summary Order.  *See* Renco Suppl. ¶¶ 12-15.  Pursuant to Rule 201(b) of the Federal Rules of Evidence, the Court will take judicial notice of the Summary Order for the sole purpose of establishing the fact that the Fraudulent Transfer Judgment was affirmed by the Second Circuit. *See Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (court may take judicial notice of relevant matters of public record); *Rothman v. Gregor*, 220 F.3d 81, (2d Cir. 2000) (court may take judicial notice of court documents).

### III.   __The Renco Group Standing to Bring this Adversary Proceeding__

### A.   __The Renco Group's Alleged Standing__

In light of the fact that the Renco Group's previous Standing Motion was denied, albeit without prejudice, this Court has concerns regarding the Renco Group's commencement of this adversary proceeding.  Based on the record of the February 2015 Hearing, and Judge Gerber's 2015 Standing Ruling, the Court finds that, in denying the Standing Motion without prejudice, Judge Gerber allowed the Renco Group to renew its previous Standing Motion, or if subsequent events warrant, to file a new motion seeking similar relief.

Instead of renewing its Standing Motion, shortly after Judge Gerber retired, the Renco Group challenged the Bond Claims by commencing this adversary proceeding.  By that time, the Fraudulent Transfer Litigation had concluded in the District Court and the Fraudulent Transfer Judgment was affirmed by the Second Circuit.  However, for the reasons discussed below, the Complaint fails to allege sufficient facts to state a facially plausible claim that the Renco Group will receive a distribution on account of its equity interests as a result of the Fraudulent Transfer Judgment, such that it would have standing to assert the claims it now pleads in the Complaint. As such, and in line with Judge Gerber's prior ruling, if the Renco Group had sought to renew its Standing Motion, granting leave would have been unwarranted.  But, instead of renewing its Standing Motion or filing a new similar motion, the Renco Group attempts to sidestep this requirement by objecting to the Bond Claims by means of an adversary proceeding, which in many ways appears to be an attempt to circumvent Judge Gerber's 2015 Standing Ruling. Notwithstanding its serious concern with the Renco Group's tactics, the Court turns to the merits of the standing issue.

18

**B.     The Renco Group's Alleged Standing as a Shareholder**

In its Complaint, the Renco Group contends that, "as the sole shareholder of . . . Metals, [it] is a 'party in interest'" under section 502(a) of the Bankruptcy Code.  Compl. ¶ 11.  Section 502(a) provides that "a claim or interest, proof of which is filed under section 501 of this title . . . is deemed allowed, unless a party in interest . . . objects."  The term "party in interest," as used in section 502(a), is not defined in the Bankruptcy Code.  In the Second Circuit, a chapter 7 debtor becomes a party in interest with standing to participate in litigation surrounding the assets of the estate "*only if* there could be a surplus after all creditors' claims are paid" pursuant to the distribution priorities set forth in the Bankruptcy Code.  *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000) (emphasis added) (citing COLLIER ON BANKRUPTCY, ¶ 21.02[2] (15th ed. 1996)); *see cf. In re Friedberg*, 634 Fed. Appx. 333 (2d Cir. Feb. 24, 2016) ("[W]e conclude that the bankruptcy court correctly held that the debtor lacked standing to oppose the approval of the settlement agreement because he had no pecuniary interest directly and adversely affected by the bankruptcy court's order adopting the settlement."); *In re Barnet*, 737 F.3d 238, 242 (2d Cir. 2013) ("[T]o have standing to appeal from a bankruptcy court ruling, an appellant must be a person aggrieved—a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court.") (internal quotations omitted).

This principal applies with respect to a debtor's standing to object to a claim against the estate.  *See Pascazi v. Fiber Consultants, Inc.*, 445 B.R. 124, 127 (S.D.N.Y. 2011) (citing *In re Manshul*, 223 B.R. 428, 429 (Bankr. S.D.N.Y. 1998)); *see also In re Vebeliunas*, 231 B.R. 181, 190 (Bankr. S.D.N.Y. 1999) (finding that a debtor is a party in interest if the liquidation of the estate will generate a surplus) (citing *In re McCorhill Pub., Inc.*, 89 B.R. 393, 395 (Bankr. S.D.N.Y. 1988); *In re Bucala*, 464 B.R. 626, 634 (Bankr. S.D.N.Y. 2012) (finding that the

19

debtor lacked standing when the "trustee has indicated—through the filing of his report—that there is no possibility of a surplus for the [debtor]."

Similarly, an equity holder, such as the Renco Group – which under Bankruptcy Code section 726(a)(6) falls at the bottom of the priority distribution scheme – lacks standing to object to claims against the estate unless there is a reasonable possibility of a surplus after all claims against the debtor's estate are paid in full. *See Pascazi*, 445 B.R. at 127 ("The rule is based on the assumption that '[t]he success of [the debtor's] objection cannot affect him because the debtor receives a distribution only after all creditors have been paid in full, and an estate will rarely have enough assets to do even that.'") (quoting *In re Ulz*, 401 B.R. 321, 328 (Bankr. N.D. Ill. 2009)). Otherwise, since equity is last in the priority distribution scheme, it is not reasonably plausible that the Renco Group will be impacted in a pecuniary way by disallowance of the Bond Claims.

Wilmington Trust and the Renco Group agree that the Debtors' estates consists of only two sources of assets: (1) the $213 million Fraudulent Transfer Judgment and (2) approximately $26.8 million in cash proceeds remaining from the sale of a portion of the estates' interest in the Fraudulent Transfer Litigation (the "Renco Litigation Interest").[11]  However, Wilmington Trust and the Renco Group offer conflicting views with respect to the estates' solvency and the likelihood of a surplus being available for distribution to equity. *Compare* Wilmington Suppl. 11-14, *with* Reno Suppl. ¶¶ 6-11.

According to Wilmington Trust, before any funds may be distributed to general unsecured creditors, the Trustee's commission ($6.4 million), Beus Gilbert PLLC's contingency fee ($87.3 million), Kellogg, Hansen, Todd, Figel & Frederick PLLC's contingency fee ($1.5.

---

[11] After the jury verdict and while the appeal from the Fraudulent Transfer Judgment was pending, on August 24, 2016, the Court entered an Order approving the sale of an interest in the Fraudulent Transfer Judgment. *See Order Pursuant to 11 U.S.C. §§ 105 and 363, and Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014 Approving Sale of Renco Litigation Interest* [Case No. 01-14312, ECF No. 745].

million), Stevens & Lee's legal fees ($2.5 million) and the Renco Litigation Interest ($50 million) each must be paid from the proceeds of the Fraudulent Transfer Judgment and/or sale of the Renco Litigation Interest. *See* Wilmington Suppl. at 12. Thus, according to Wilmington Trust, a total of only approximately $92.3 million would then be available for distribution to general unsecured creditors. *See* Wilmington Suppl. at 12.

Next, Wilmington Trust points out that the total amount of outstanding claims, proof of which are reflected on the Debtors' Claims Registers, exceeds $670 million, a fact with which the Renco Group agrees. *See* Compl. ¶ 29. In addition, the Government asserts a variety of environmental liabilities, *see* Government Proofs of Claim, the total value of which remains unliquidated. *See* Wilmington Suppl. at 12-13; Compl. ¶ 29. Wilmington Trust calculates the total value of all claims against the Debtors, including the Environmental Claims, as approximately $725 million. *See* Wilmington Suppl. at 13. Wilmington Trust also contends that, even if the Bond Claims were disallowed in their entirety, "a total of more than $450 million in claims . . . are situated in front of any distribution to [the] Renco [Group]." Wilmington Suppl. 13. Thus, according to Wilmington Trust, simple arithmetic makes clear that there is zero possibility that there will be a surplus available for distribution to equity.

The Renco Group, on the other hand, discounts the $670 million in claims reflected on the Debtors' Claims Registers and argues that the Claims Registers are vastly overstated and contain numerous duplicative claims. Compl. ¶ 29; Renco Supp. ¶ 7. Moreover, the Renco Group argues that the Court may only take judicial notice that the proofs of claim were filed, but may not take judicial notice of the validity, accuracy or the amount owing with respect thereto. Renco Supp. ¶¶ 22-23. In support of its position, the Renco Group highlights that, in 2001, when

21

the cases were initially filed, the Debtors' estimation of general unsecured claims against them totaled approximately $6 million.  Compl. ¶ 29; Renco Supp. ¶ 7.

The Renco Group also discounts the magnitude of the Environmental Claims and makes the conclusionary allegation in its Complaint that "[a]ny environmental remediation obligations, to the extent they are not undertaken by the current owner of the MagCorp property and assets, are likely to be immaterial."  Compl. ¶ 29.  It also argues that "Metals is unlikely to face *any* environmental liabilities because it is merely the holding company of MagCorp . . . ."  Renco Suppl. ¶ 10 (emphasis added); *see* also Compl ¶ 11.  The Renco Group therefore asks the Court to draw the inference that the Environmental Claims will be insignificant and immaterial once the claims have been resolved:

> The fact that we've pled, Your Honor, is that to date, the only liabilities that have been assessed on an environmental basis have been $2,500. We then ask you to draw the reasonable inference from that that the environmental claims will be immaterial. That's an inference that's being drawn and our legal theory underlying that is that those claims will be objected to.

Suppl. Hr'g Tr. 17:18-24 [ECF No. 48].[12]  The Complaint contains no factual assertions in support of this conclusion.

In sum, the Renco Group argues that the Debtors' only "substantial liability is their purported liability on the Bond Claims, in the alleged amount of approximately $170 million." Compl. ¶ 30.  Based on these assertions, the Renco Group argues that if the relief requested in the Complaint is granted and the Bond Claims are disallowed, Metals will have sufficient assets to

---

[12] The Government, which filed the Environmental Claims against MagCorp and Metals but is not a party to this adversary proceeding, has filed a letter urging the Court not to rely on the Renco Group's assertions concerning the Debtors' liability to the Government or the allocation of the Fraudulent Transfer Judgment proceeds between the Debtors in resolving this Motion to Dismiss. *See Letter Concerning Assertions by The Renco Group, Inc.in its Complaint and in Connection with the Bondholders' Motion to Dismiss Related to the United States of America's Claims in the Bankruptcy Proceeding* [ECF No. 46].

pay the remaining creditors in full and make a distribution to the Renco Group on account of its

equity interest, thereby giving the Renco Group standing to object to the Bond Claims in this

adversary proceeding. *See* Renco Suppl. ¶ 22-23

The Court finds that the inferences which the Renco Group asks the Court to draw from its

allegations in support of its claim (that there will be a surplus of assets available for distribution to

equity) are not reasonable. The Renco Group's Complaint asserts conclusions regarding legal

issues that are without support and as such, its claim of entitlement to a distribution as a shareholder

is not plausible on its face. First, and most obvious, the Renco Group fails to account for the

litigation costs associated with obtaining the Fraudulent Transfer Judgment (totaling

approximately $120 million) and costs the Trustee will incur in negotiating and/or litigating the

Environmental Claims, which under the Bankruptcy Code indisputably are afforded priority over

creditors and equity holders. *See* 11 U.S.C. § 726(a). Second, the Renco Group's allegation

concerning the value and/or legitimacy of the Environmental Claims are interwoven in legal

conclusions that the Court is "not bound to accept as true." *Papasan*, 478 U.S. at 286 (1986).

Third, the Renco Group asks the Court to infer from the allegations in its Complaint that if the

Bond Claims were disallowed, the total value of all claims (other than the Environmental Claims)

against Debtors' estates will be reduced from approximately $670 million to $0. *See* Compl. ¶ 30;

Renco Supp. ¶ 7. Even if the Court were to draw an inference that (i) as in many large commercial

bankruptcy cases, creditors file duplicate claims that ultimately are disallowed during the claims

resolution process, and (ii) if the Renco Group were to be successful in this adversary proceeding,

resulting in the disallowance of the Bond Claims, there would be a dramatic reduction in the value

of all outstanding claims against the Debtors by approximately $340 million (*i.e.*, the $170 million

bond claim in each of the Debtors' cases), it is nonetheless not plausible that the Renco Group

would be impacted pecuniarily by pursuing the relief sought in the Complaint. Even without considering the Environmental Claims – which it is not reasonable to infer will be "immaterial" as the Renco Group alleges, *see* Compl. ¶ 29 – there would still remain hundreds of claims valued in the hundreds of millions of dollars on the Debtors' Claims Registers. *See BLT Rest.*, 855 F. Supp. 2d at 15 (finding that courts are "'not required to draw unreasonable inferences or to credit legal conclusion at odds with the plaintiff's own factual allegations.'"); *Reade-Alvarez*, 369 F. Supp. 2d at 359 (a "[c]ourt is not obligated to draw unreasonable inferences in plaintiffs' favor" on a motion to dismiss).

As such, it is not facially plausible based on the allegations made in the Complaint that claims valued in the hundreds of millions of dollars ultimately will be disallowed to an extent that would result in the availability of estate assets sufficient for a distribution to the Renco Group. *See Iqbal*, 556 U.S. at 678 ("only a complaint that states a plausible claim for relief survives a motion to dismiss") (citing *Twombly*, 550 U.S. at 556)). Accordingly, the Renco Group lacks standing as an equity holder to bring this adversary proceeding.

### C.  The Renco Group's Alleged Standing as a Creditor

In its Complaint, the Renco Group plead only that it has standing to bring this adversary proceeding as a shareholder. Compl. ¶ 11. However, in its supplemental briefing, the Renco Group asserts that it has a claim against the Debtors' estates[13] and therefore has standing as a creditor to object to the Bond Claims. *See* Renco Suppl. ¶¶ 26-29. It is true that, under section 502(a), a creditor *may* have standing to object to claims. "A creditor is a 'party in interest' under § 502(a) and thus, at least in theory, has standing to object to the claim of another creditor."

---

[13] The Renco Group alleges for the first time in its supplemental brief that it has a claim under Bankruptcy Code section 502(h) against the Debtors. *See* Proof of Claim No. 56 (the "Renco Proof of Claim") [Case No. 01-14312, Proof of Claim No. 56]. As discussed below, the Renco Group could not have alleged in the Complaint that it has standing based on its proof of claim, because it did not file its claim until well after the Complaint had been filed.

*Pascazi v. Fiber Consultants, Inc.*, 445 B.R. 124, 128 (S.D.N.Y. 2011) (citing *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1391 (7th Cir. 1996)).   However, the right of one creditor to object to another creditor's claim is not absolute and is subject to judicial limitation.   *See Pascazi*, 445 B.R. at 129.   Policy considerations, including the necessity for an orderly and expeditious administration of the estate, have led the majority of courts that have addressed the issue to conclude that as "a general rule, absent leave of court, the chapter 7 trustee alone may interpose objections to individual proofs of claim."   *Id.* (quoting *In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992)) (internal quotations omitted); *see* also 1983 *Advisory Committee Note to F.R.B.P. 3007* ("the demands of orderly and expeditious administration have led to a recognition that the right to object [to claims] is generally exercised by the trustee").

The principle described above was expressly adopted by the District Court in *Pascazi*, where Judge Pauley affirmed the Bankruptcy Court's decision denying the debtor's shareholder and creditor standing to object to claims because doing so "would threaten the orderly and expeditious administration of proceedings."   445 B.R. at 129.   *Pascazi* concerned chapter 7 case in which a trustee had been appointed to administer the debtor's estate.   Notwithstanding the appointment of a chapter 7 trustee, an individual asserting to be the debtor, its shareholder and its creditor (Mr. Pascazi) objected to a claim against the debtor.   The Bankruptcy Court overruled the objection and *sua sponte* raised the issue of Mr. Pascazi's standing to object to claims. *See id.* at 126.   Mr. Pascazi then filed a letter requesting that the chapter 7 trustee investigate and object to the claim at issue, to which "the [t]rustee responded that he would 'examine all claims once the liquidation process is complete, and will object to claims where appropriate.'"   *Id.* (internal citation omitted).

On appeal to the District Court, Mr. Pascazi argued that he had standing to object to claims filed against the chapter 7 debtor based on "his status as a debtor, creditor, and equity security holder." *Id.* at 127. Judge Pauley disagreed, and held that "Pascazi only has standing to object to the claim as a debtor if he can demonstrate a 'reasonable possibility of surplus once all claims are paid.'" *Id.* (internal citation omitted). Moreover, Judge Pauley explained that the principle that a creditor is a party in interest with standing to object to claims "is subject to a significant—though not universally adopted—judicial limitation." *Pascazi*, 445 B.R. at 128–29. Based on the underlying policy of ensuring an orderly and expeditious administration in bankruptcy, the District Court adopted the rule adopted by a majority of courts that, "absent leave of court, the chapter 7 trustee alone may interpose objections to individual proofs of claim." *Id.* at 129 (internal citations omitted). Judge Pauley went on to explain that "[u]nder the majority rule, leave to object is not generally accorded an individual creditor unless the chapter 7 trustee refuses to object, notwithstanding a request to do so." *Id.* (internal quotation omitted). The court reasoned that the purpose of this rule is to ensure that the orderly administration of a case does not degrade to chaos. *See id.* Thus, in order for a creditor to have standing to object to another creditor's claim(s), the creditor must first request that the trustee investigate and object and, if the trustee refuses, the creditor may then seeks leave of the Bankruptcy Court, which may grant the creditor standing to object to other claims. *See Pascazi,* 445 B.R. at 128–29.

The Renco Group argues that recent case law in this District rejects the majority rule requiring a creditor to seek leave of the Bankruptcy Court before objecting to other creditors' claims. *See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss* ¶ 28 [ECF No. 24]; Renco Suppl. ¶¶ 28-29. In support of its argument that it has standing to pursue this action without first seeking leave for the Bankruptcy Court, the Renco Group relies on a

decision by Judge Bernstein, in *In re Ampal-Am. Israel Corp.*, 545 B.R. 802, 808 (Bankr. S.D.N.Y. 2016).   In that case, the Bankruptcy Court found that certain creditors had standing to object to claims under the circumstances of the case before it.   *See Ampal-Am. Israel Corp.*, 545 B.R. at 808.   However, that case is clearly distinguishable.   There, although the Court acknowledged the majority rule, it did not need to decide whether the majority rule applied because the chapter 7 trustee in that case did not oppose the creditors' efforts to disallow or reduce the claims, and did "not intend to file his own objection" to the claims.   *Id.* at 809.   Here, however, the Renco Group has failed to allege any facts in its Complaint that it first requested that the Trustee investigate and object to the Bond Claims.   And, as discussed above, the Renco Group never sought leave of this Court to renew its claim of standing which was previously denied (without prejudice) by Judge Gerber.

The majority rule applies equally to creditors asserting claims under Bankruptcy Code section 502(h),[14] the Bankruptcy Code provision on which the Renco Group bases its claim against the Debtors.   Here, the Renco Group and Wilmington Trust disagree as to whether the Renco Group qualifies as a creditor pursuant to section 502(h).   Because this issue is not properly in front of the Court at this time, the Court must refrain from deciding it.   For the purposes of the Motion to Dismiss, the Court notes that the Renco Group did not plead in the Complaint that is has standing as a creditor. In fact, the Renco Group did not file and the Renco Group Proof of Claim (on which it predicates its argument that is has standing as a creditor) until over nine months *after* the

---

[14] Section 502(h) provides that: "[a] claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition. 11 U.S.C. § 502(h).  Claimants under section 502(h) are deemed to be holders of unpaid pre-petition claims.  *See cf. In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007); *In re Residential Capital, LLC*, No. 12-12020 (MG), 2015 WL 3507128, at *7 (Bankr. S.D.N.Y. June 2, 2015) (citing *In re Allied Companies, Inc.*, 155 B.R. 739, 744 (Bankr. S.D. Ind. 1992)).

Complaint was filed, laying bare the tactical nature of the Renco Group's latest initiative in commencing this adversary proceeding. Here, there is no doubt that allowing the Renco Group to pursue a claim objection by means of this adversary proceeding would disrupt the orderly and expedition administration the Debtors' estates. *See Pascazi*, 445 B.R. at 129.

This Court echoes Judge Gerber's strong sentiments that "[section] 502(a) of the Bankruptcy Code is designed to maximize the estate for the benefit of all general creditors; it is not designed to enable a lone creditor to act solely in his own self-interest." Feb. Hr'g Tr. 34:11–13. By bringing this adversary proceeding, the Renco Group is attempting to achieve an ironic and almost inconceivable result of aligning itself to be repaid monies which it has been adjudicated to owe to the Debtors' estates as a result of the Fraudulent Transfer Judgment. The Court concludes that, in the light of Judge Gerber's 2015 Standing Ruling and under applicable law in this District discussed above, the Renco Group lacks standing to bring this adversary proceeding as a creditor of the Debtors' estates.

*CONCLUSION*

For the reasons set forth above, the Court concludes that the Renco Group lacks statutory standing to bring this adversary proceeding. The Motion to Dismiss is granted and the Complaint is dismissed without prejudice.  Based on the ruling that the Renco Group lacks standing to bring this adversary proceeding, the Court will not address the remaining arguments made by Wilmington Trust in support of the Motion to Dismiss.  The Clerk of Court is directed to close this adversary proceeding.

**It is so ordered.**


Date: New York, New York
       March 30, 2018

                              *s/ Mary Kay Vyskocil*
                              Honorable Mary Kay Vyskocil
                              United States Bankruptcy Judge